**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0803-24

IN THE MATTER OF
BRIAN S. MORTON,
FIRE OFFICER 1 (PM2390C),
NORTH HUDSON FIRE
AND RESCUE.

_____

Submitted May 12, 2026 – Decided July 21, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the New Jersey Civil Service Commission, Docket No. 2023-2283.

Brian S. Morton, self-represented appellant.

Jennifer Davenport, Attorney General, attorney for respondent New Jersey Civil Service Commission (Sookie Bae-Park, Assistant Attorney General, of counsel; Craig S. Keiser, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Brian S. Morton appeals from a September 25, 2024 Final Administrative Action of the New Jersey Civil Service Commission

(Commission or CSC) denying his appeal of the scoring of his promotional examination for the position of Fire Officer 1. Morton challenges the substantive evaluation of his answers and the procedural fairness of the appeal process. Having reviewed the record in light of applicable legal principles, we affirm.

I.

The CSC administers written and oral examinations to determine the ranking of candidates on a promotion list for State employment job openings. In 2022, Morton completed the promotional examination for Fire Officer 1, which consisted of a written and oral examination. Morton passed with a combined score of 87.680, ranking thirty-first on the promotion list.

After attending a review of the examination on April 3, 2023, Morton administratively appealed his results.[1] He was permitted to submit written arguments challenging the scoring and criteria and evidence in support of his claims. On September 25, 2024, the Commission issued its written decision

---

[1] Morton's appeal concerned seven questions of the written examination. Upon review, the CSC overturned three of the seven in appellant's favor. The results of Morton's written examination are not before us on appeal.

A-0803-24

determining the scoring decision was amply supported and Morton failed to meet his burden of proof in challenging the results.[2]

In pertinent part, Morton argued he received an erroneous score of two on the technical component of the "evolving scenario" section of the oral examination. By way of brief summary, the evolving scenario, designed to measure knowledge of safe rescue tactics and procedures, concerned a hypothetical fire on the second floor of a college dormitory with the candidate serving as the first-level supervisor of the first arriving engine company, "Engine 4." In the scenario, "Engine 5" is seven minutes away, and the fire was reported ten minutes earlier. The sprinklers are functioning, and there are two unaccounted students on the second floor. The candidate's engine company is ordered to establish a primary water supply and attack the fire as "Ladder 2" conducts a primary search. "Engine 5" will be responsible for a secondary water supply.

Question one required the candidate to explain the appropriate commands the supervisor would give the crew to execute the incident commander's orders.

---

[2] In Morton's appendix, he includes an email exchange wherein he requests a transcript from the Commission's review of his appeal. In response to Morton's email, the Commission stated it "does not record or transcribe Commission meetings."

A-0803-24

Question two asked what the supervisor would do if the crew approached the "seat of the fire" to find two unconscious students in the hallway, while "Ladder 2" is by the elevator on the second floor.

Candidates' responses were graded by subject matter experts (SMEs), who determined scoring criteria using generally approved fire command and firefighting practices and various reference materials. Scoring decisions were based on SME-approved possible courses of action (PCAs) to resolve the issue as presented. Candidates were scored on a five-point scale: five being an optimal response, four, a more-than-acceptable response, three, a minimally acceptable passing response, two, a less-than-acceptable response, and one, a much-less-than-acceptable response.

Morton's evolving scenario response scored a two on the technical component, a four on the supervision component, and a five on the oral communication component. Morton challenged only his score of two on the technical component of the evolving scenario.

The SME awarded Morton a two for "fail[ing] to perform the mandatory action of ordering the fire department connection (FDC) standpipe/sprinklers to be fed and miss[ing] a number of additional opportunities, including, in part, the opportunity to ensure fire doors are properly controlled."

A-0803-24

In challenging his score, Morton disputed the validity of "requiring the first due engine to always feed the FDC as a mandatory response."  In support, Morton relied on a textbook, John Norman, Fire Officer's Handbook of Tactics (4th ed. 2012) [hereinafter Norman], which was "suggested reading" included in the Commission's "2021 1st Level Fire Supervisor Orientation Guide."  Morton cited Norman, which states, "One of the first-arriving engine companies should be assigned the duty of supplying the sprinkler."  Id. at 125.  Morton argued Norman does not compel in all instances the first engine to supply the sprinklers, and because the scenario prompt did not have the incident commander assign the candidate/supervisor the duty of supplying sprinklers, it should not have been considered a mandatory response for the candidate/supervisor.

Morton also relied on Norman to suggest that connecting the sprinkler system and "handlines" to the same hydrant would cause the pressure in the sprinkler system to drop, which could allow the fire to overwhelm the sprinkler system.  Morton further cited Norman for the proposition that using the sprinkler system would reduce the survival chances for unaccounted individuals as sprinklers would push gases to the floor and pose a danger to fire personnel because sudden operation of sprinklers could cause steam and hot water to descend on fire personnel, forcing them to retreat.  Finally, Morton claimed it

A-0803-24

would be wrong to assume the first engine would be required to feed the FDC because the incident commander never ordered the standpipe or sprinkler to be fed, and "there is no literature" that supports such a proposition.

As to controlling the fire doors, Morton asserted the scenario's written materials and diagram did not indicate the location of any fire doors. He argued that if the fire doors were the stairwell doors, they would have to be open for firefighters to attack the fire. He further contended other candidates failed to mention the fire doors in their responses but were not penalized for it.

The Commission addressed Morton's appeal at a hearing and allowed candidates to listen by phone and later issued its written determination. In affirming Morton's test results, the Commission stated it based its analysis on the findings of the Division of Test Development, Analytics and Administration (TDAA), which is comprised of a panel of SMEs. The Commission found deficient Morton's claim that feeding the FDC should not be a mandatory response noting, the prompt stated "the sprinkler system is functioning," signaling it would have been functioning upon arrival at the scene, negating Morton's claim that feeding the FDC would risk a hazardous condition, and finding Morton "misconstrue[d] Norman" because, contrary to Morton's

A-0803-24

assertion, Norman "repeatedly emphasizes the importance of utilizing sprinkler systems to combat working fires."

The Commission cited several passages from Norman for the proposition that "connecting the FDC" is proper because it would aid, rather than overwhelm, the sprinkler system in getting water to the "seat of the fire," clarifying that Norman merely identifies potential issues rather than advising non-use of the FDC. It also explained feeding the FDC would not cause water pressure to decrease in the sprinkler system because such systems contain certain valves to ensure the sprinkler system "will not fall below what's being fed into the system from the main supply line." The Commission further maintained, because the prompt explicitly stated, "Engine 5 will be responsible for securing a secondary water supply," any concern about water pressure on scene lacked merit.

As to the fire doors, the Commission explained the candidate was required to "[e]nsure fire doors [we]re properly controlled (propped open, managed)." Acknowledging there was no requirement that fire doors in a specific location be addressed, the Commission noted it was expected that fire doors needed for operations would stay open while other doors necessary to contain the fire remained closed. Thus, the Commission concluded the absence of designated

A-0803-24

fire doors in the written materials or diagram was "immaterial" to Morton's failure to address fire doors in his response.

Addressing Morton's additional claim other applicants received no deduction for failing to identify fire doors, the Commission indicated applicants are "not necessarily given an exhaustive list of every PCA they missed in their responses." According to the Commission, simply because other applicants were not told they failed to identify the fire doors does not mean they were not marked down for any such failure. Thus, the Commission concluded Morton failed to "meet his burden of proof" and affirmed his score of two on the technical component of the evolving scenario.

After the Commission's decision, Morton contacted the Attorney General's Office seeking to obtain a scoring sheet Morton claims was "utilized" by the evaluator to assess his performance on the evolving scenario component of the oral examination. In response, a Deputy Attorney General explained that he did not have the document Morton requested.

On appeal, Morton argues the Commission's decision was arbitrary and capricious, asserting the answers he provided in his oral examination were "aligned with established firefighting tactics." He further contends the Commission deprived him of due process by denying him the ability to

8

"adequately present [his] case" during the hearing affording candidates only the ability to "call in to listen to the hearing." He argues the Commission improperly withheld a hearing transcript or scoring sheet and unduly delayed releasing his scores, impeding his ability to fully and fairly prepare and present his case.

II.

The scope of judicial review of a final agency determination is very narrow. See Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018); see also In re Carter, 191 N.J. 474, 482 (2007). Our review inquires:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Hermann, 192 N.J. 19, 28 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Further, "a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." Ibid.

The New Jersey Constitution and the New Jersey Civil Service Act, N.J.S.A. 11A:1-1 to 12-6, espouse the general maxim that state employees be

9

selected based on merit.  N.J. Const. art VII, § 1, ¶ 2; N.J.S.A. 11A:1-2(c).  In furtherance of this goal, the Commission is empowered to select and retain state employees.  N.J.S.A. 11A:2-6.

Relevant here, N.J.S.A. 11A:4-1 imparts to the Commission the power to "administer examinations" to test "skills and abilities," grade examinations, secure the examination process, and select "special examiners to act as subject matter specialists or provide other assistance."  Regarding the Commission's administration and grading of civil service examinations,

> [t]he fulfillment of that function is a matter requiring special expertise, involving as it does the determination of what job knowledge, skills and abilities are necessary or desirable in a candidate for a particular position, and the highly technical problem of devising suitable examination questions which will demonstrate as accurately as possible whether an applicant possesses those requirements sufficiently to qualify for the position.
>
> [In re Police Sergeant (PM3776V), 176 N.J. 49, 59 (2003) (quoting Brady v. Dep't of Pers., 149 N.J. 244, 257 (1997)).]

Therefore, we will not "engage in a critical supervisory examination of the composition of the questions to be propounded to candidates" or review the contents of the examination to determine "whether the questions were 'well or poorly answered.'"  Brady, 149 N.J. at 258 (quoting Brady v. Dep't of Pers., 289

N.J. Super. 557, 564 (App. Div. 1996)). Accordingly, "the mere possibility of erroneous scoring" is insufficient to warrant our intervention. Id. at 263.

Against this backdrop, we first address and reject Morton's challenge to the scoring. Morton claims that his response was supported by "best practices," relying on Norman for the proposition that requiring the first arriving engine to feed the FDC should not be mandatory. However, we are satisfied the Commission anchored its decision in the record and adequately explained its findings, and we discern no error.

The Commission's written Final Administrative Action was supported by its reliance on a panel of SMEs and excerpts from Norman, which was both a "suggested reading" resource for fire supervisor candidates, and relied upon by Morton himself. Specifically, the Commission cited to Norman's actually advocating for the "prompt" use of sprinkler systems to fight fires, and "connecting the FDC," rather than relying entirely on manual firefighting efforts. Further, as to Morton's claim that he should have received credit even though he failed to address the fire doors, the Commission reasonably relied on responses prepared by the TDAA concluding Morton failed to adequately consider the fire doors in his response. Therefore, we conclude the Commission

11

acted within its broad discretion to administer and score examinations for State employees.

Turning to Morton's due process claims, we recognize "[a]dministrative hearings in contested cases must 'operate fairly and conform with due process principles.'" In re Kallen, 92 N.J. 14, 25 (1983) (quoting Laba v. Newark Bd. of Educ., 23 N.J. 364, 382 (1957)). However, such hearings "may conform to procedural due process standards that are less restrictive than those imposed in court proceedings." Id. at 26. "As long as principles of basic fairness are observed and adequate procedural protections afforded, the requirements of administrative due process have been met." Kelly v. Sterr, 62 N.J. 105, 107 (1973). Due process generally requires "notice and an opportunity to be heard." Cano v. Cnty. Concrete Corp., 483 N.J. Super. 459, 484 (App. Div. 2026). As it pertains to administrative appeals before the Commission, N.J.A.C. 4A:2-1.1(d) states, "Except where a hearing is required by law, this chapter or N.J.A.C. 4A:8, or where the Civil Service Commission finds that a material and controlling dispute of fact exists that can only be resolved by a hearing, an appeal will be reviewed on a written record."

Here, Morton was provided with the "Commission Comment/Appeal Form," which outlined the requirements for a valid appeal. He was permitted to

12

present his written argument and any supporting evidence he elected to submit, which he did. The Commission then addressed all Morton's arguments, including his citations to Norman in support of his argument, and detailed its findings and reasoning. We discern no due process violation in the Commission's not entertaining oral argument.

Regarding Morton's claim the Commission impaired his ability to advance his appeal by unfairly withholding the grading sheet used to score his oral exam, we are similarly unpersuaded. It is squarely within the Commission's authority to ensure the "security of the examination process." N.J.S.A. 11A:4-1. This includes keeping confidential "examination papers and scoring keys," N.J.A.C. 4A:4-2.16, and requiring candidates to make an appointment to review an examination, but prohibiting the copying of any of the questions or answers. N.J.A.C. 4A4-6.4(b).

Brady is instructive here. The Court in Brady balanced examination security with candidates' rights to challenge their scores. Brady, 149 N.J. at 260-61. It determined permitting a candidate to "review a portion of his written test materials, including his answers, a very brief summary of each question, brief comments by the grader about the PCAs that plaintiff had missed, . . . and an explanation of the scoring process" sufficiently allowed the candidate to

13

fairly pursue his appeal, despite the Commission's restricting any access to test questions and answer keys. Id. at 251, 260. In so holding, the Court noted full disclosure of examination materials "would confer little or no administrative or litigational benefit on the examinee, given the general prohibition against judicial regrading of examinations." Id. at 261.

Here, Morton does not dispute he had the ability to review his oral examination. Additionally, both Morton's merits brief and the Commission's written decision refer extensively to Morton's responses and the PCAs he missed. We perceive no basis to conclude Morton was denied adequate opportunity to review his oral examination results prior to his appeal.

Nor do we agree with Morton's assertion "[t]he timeline of events surrounding the current testing cycle administered by the [Commission] demonstrates an unreasonable and excusable delay, evidencing negligence in the handling of the examination and appeal process." Generally, to warrant our intervention, an agency's failure to act requires showing "gross indifference, inexcusable neglect or bad faith." See Klusaritz v. Cape May Cnty., 387 N.J. Super. 305, 314 (App. Div. 2006). This record raises no such concern.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hadley

Clerk of the Appellate Division

A-0803-24